## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,

        Plaintiff,

    vs.                                      No. **CR 07-2535 MCA**

**JESUS CECENAS-ROSALES**,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** came before the Court on *Defendant's Motion to Suppress Evidence Obtained as a Result of Illegal Stop, Detention/Arrest, Search and Seizure and Motion for Suppression of Illegally Obtained Evidence and Statements* [Doc. 34] filed on April 24, 2008, and *Defendant's Amended Motion to Dismiss for Government's Failure to Comply with Continuing Duty to Disclose Under Rule 16, Fed. R. Crim. P. or in the Alternative Motion to Strike Waiver of Rights* [Doc. 46] filed on June 9, 2008.  The Court held an evidentiary hearing on Defendant's motion to suppress in Albuquerque, New Mexico, on May 27, 2008. [Doc. 45.]  Having considered the parties' submissions, the applicable law, the evidence and the arguments of counsel presented at the hearing, and being fully advised in the premises, the Court grants in part and denies in part Defendant's motion to suppress, and denies Defendant's motion to dismiss or strike, based upon the findings of fact and conclusions of law set forth below.

## I.   **FINDINGS OF FACT**

1.      Witness John Valdez has been a patrolman with the Motor Transportation Division of the New Mexico Department of Public Safety for over twelve years; he has received training in drug interdiction and has conducted numerous traffic stops and vehicle searches resulting in the seizure of illegal drugs.

2.      Using a radar gun, Officer Valdez was monitoring the speed of vehicular traffic in the Raton Pass area of Interstate 25 in Colfax County, New Mexico, during daylight hours on the afternoon of Thanksgiving Day, November 22, 2007, when the following events occurred.

3.      Officer Valdez credibly testified that he observed a white four-door sedan traveling uphill and northbound at 65 miles per hour in a posted 55 mile-per-hour zone at Mile Marker 454, which is approximately six miles from the border between New Mexico and Colorado; Defendant's testimony that he was not speeding at that time is not credible.

4.      Following the officer's observation that the white sedan was speeding, he followed the vehicle and turned on his emergency lights, as well as the dashboard camera which recorded the traffic stop that followed.

5.      The driver of the white sedan responded to the officer's actions by pulling to the shoulder of the roadway and stopping beside the guardrail at approximately Mile Marker 459.

6.      Officer Valdez's initial traffic stop of the white sedan and its occupants on Interstate 25 was supported by a reasonable suspicion that the vehicle was speeding.

7.      As shown on the recording from the dashboard camera that was subsequently introduced into evidence at the suppression hearing [Ex. 10], Officer Valdez exited his vehicle and walked up to the passenger side of the white sedan, where he observed the driver and one passenger in the front seat.

8.      The driver of the white sedan was later identified as the Defendant, Jesus Cecena-Rosales; the passenger was later identified as Defendant's teenage son.

9.      While standing beside the white sedan and speaking through the open front passenger door, Officer Valdez advised the driver of the reason for the stop and requested a driver's license, registration, and proof of insurance.

10.      The ensuing conversation between the officer and the occupants occurred partly in English and partly in Spanish; when Defendant indicated that he was having difficulty understanding a particular phrase or sentence in English, the officer would repeat that phrase or sentence in Spanish so that Defendant could understand.

11.      Portions of this conversation were recorded through a microphone mounted on the officer's person; however, other portions of the conversation are missing from the recording because the officer's microphone was out of range or because he failed to tune it to the right frequency during those parts of the conversation.

12.      Under the totality of the circumstances, Defendant was not under arrest while at the scene of the initial traffic stop on the shoulder of the highway, and the statements he made while at that location were not taken in violation of his constitutional rights or otherwise tainted by any prior illegality on the part of the Government.

13.     While awaiting the occupants' response to his initial request for documents, Officer Valdez smelled a heavy odor, consistent with a masking agent, emanating from the passenger compartment of the white sedan.

14.     At the suppression hearing, the Government presented a series of documents taken from the white sedan, and those documents had a very heavy odor.

15.     While standing outside the white sedan, Officer Valdez observed some tools in plain view on the vehicle's center console, as well as a key chain dangling from the ignition key which, to the officer, appeared to depict a religious icon.

16.     When Defendant handed his driver's license, vehicle registration, and proof of insurance to the officer, the officer observed that Defendant's hands were shaking.

17.     Officer Valdez's review of these documents revealed that Defendant had a Colorado driver's license, but the white sedan was registered to another individual named "Manuel Munoz Munoz" in Arizona, and the insurance on that vehicle had been purchased quite recently; thus, it became apparent to the officer that none of the occupants present at the scene owned the white sedan in which they were traveling.  [Ex. 6, 7, 8.]

18.     After making the observations described above, the officer went back to his vehicle to begin taking down the information needed to prepare the traffic citation for the speeding violation.

19.     The officer stepped out of his police vehicle a short time later and directed the Defendant to step out of the white sedan.

20.     As the two men stood outside in front of the officer's vehicle, Officer Valdez engaged the Defendant in a conversation about how the Defendant and his son came to possess the white sedan and their relationship to its owner.

21.     Defendant initially told the officer that his son had the telephone number for the white sedan's owner and that he was using the white sedan with the owner's permission because his own vehicle had broken down.

22.     Officer Valdez then went to Defendant's son, who remained seated in the white sedan, and asked him if he had the telephone number for the vehicle's owner; Defendant's son stated that he did not.

23.     Officer Valdez asked Defendant's son to describe the vehicle that had broken down, and Defendant's son described it as a red Pathfinder.

24.     Officer Valdez then returned to the location where the Defendant was standing and told him that his son did not have the telephone number for the white sedan's owner; Defendant responded by looking for the number on a series of cards he kept in his wallet.

25.     Eventually, Defendant's son gave him a card with a telephone number and the name "Don" written on it; Defendant read the number to the officer and then handed him the card.  The officer also wrote down the telephone number on the traffic citation he was preparing.

26.     Officer Valdez asked the Defendant to describe the vehicle that had broken down, and Defendant described it as a Chevrolet Cavalier.

27.     Officer Valdez also asked Defendant about his travel itinerary; Defendant stated that he had been in Phoenix for three days.

28.     Officer Valdez walked back to the white sedan and asked Defendant's son the same question; Defendant's son told the officer that he had been in Phoenix for one day.

29.     As shown on the recording from the dashboard camera that was subsequently introduced into evidence at the suppression hearing [Ex. 10], Officer Valdez advised the Defendant that he was going to issue a warning citation for the speeding violation and directed Defendant to follow him to "the port" (meaning a nearby port of entry operated by the State of New Mexico).  [Ex. 10.]

30.     Before beginning the short trip to the port of entry, the officer handed some documents to Defendant; it is not clear, however, whether all of Defendant's documents were returned to him at that time.

31.     In any event, Defendant was not free to leave at the time the officer directed him to the port of entry, as the officer had not yet completed the traffic citation.

32.     In his testimony at the suppression hearing, the only reason that Officer Valdez gave for relocating the traffic stop from the shoulder of the highway to the port of entry was to obtain better telephone service; according to the officer, his cell phone service was "spotty" along the stretch of highway where the initial traffic stop occurred, but the port of entry had a land line where he could call the number that Defendant had provided for the alleged owner of the white sedan.  [Tr. 5-27-08, at 53.]

33.     Officer Valdez offered no explanation for why he could not have confirmed or dispelled his suspicions about the telephone number by less intrusive means, such as checking police databases to determine whether the vehicle had been reported stolen, or using his car radio to direct another officer to place the telephone call to the white sedan's alleged owner from the land line at the port of entry, and then relaying that information to Officer Valdez through the dispatcher on his police radio while he remained at the scene of the initial traffic stop.

34.     Under the totality of the circumstances, Officer Valdez exceeded the permissible scope of the traffic stop when he relocated Defendant and the white sedan from the shoulder of the highway to the port of entry.

35.     Although Officer Valdez had reasonable suspicion to further investigate whether Defendant and his son were in lawful possession of the white sedan at the time he moved the traffic stop to the port of entry, at that time he had not yet established probable cause to believe that Defendant, his son, or the white sedan were involved in any criminal activity (other than the speeding violation noted above).

36.     Defendant complied with Officer Valdez's commands by getting back into the white Sedan and following the officer to the port of entry, first driving northbound to the next overpass a few hundred yards from the site of the traffic stop, then turning southbound and driving a similar distance on a frontage road to the port of entry located beside the southbound lane of the highway.

37.     Defendant parked the white sedan in a parking lot beside the main building at the port of entry; Officer Valdez parked his police vehicle a short distance behind the white sedan so that it remained within the area recorded by his dashboard camera.

38.     The short trip from the shoulder of the roadway to the port of entry took approximately three minutes and is depicted on the recording from the officer's dashboard camera as well as the diagrams which were introduced into evidence at the hearing.  [Ex. 4, 5, 10.]

39.     While Officer Valdez did not explain to Defendant or his son the nature of the facility to which they were being taken at that time, the evidence subsequently introduced at the suppression hearing indicates that the port of entry at issue here is a facility run by the State of New Mexico which serves as a *de facto* police station for patrolmen such as Officer Valdez and a venue where commercial truck drivers purchase permits and have their vehicles inspected in order to travel through the State; this facility is not akin to an airport or bus station frequented by the general public, and there do not appear to be any privately run businesses (such as restaurants or gas stations) at that location.

40.     As shown on the recording from the dashboard camera that was subsequently introduced into evidence at the suppression hearing [Ex. 10], Officer Valdez directed Defendant and his son to "go around front and wait inside" the port of entry; Defendant and his son complied with this instruction.

41.     The officer then went into another part of the building to call the telephone number written on the card that Defendant had earlier provided; upon calling that number,

the officer received an automated message stating that the call could not be completed as dialed.

42.     While the officer made this telephone call and used the restroom,  Defendant and his son waited inside a room at the port of entry that was staffed by one or more State officials operating the counter where commercial truck drivers purchased permits and/or arranged to have commercial vehicles weighed or inspected at the port of entry.

43.     Defendant and his son were not free to leave the port of entry, as Officer Valdez was still conducting his investigation and had not yet issued the traffic citation.

44.     After making the telephone call described above, Officer Valdez went to the waiting room where Defendant and his son were located in order to continue questioning them.

45.     As the officer approached them in the waiting room at the port of entry, Defendant was attempting to make a telephone call; Officer Valdez interrupted this attempt and resumed questioning the Defendant.

46.     After advising that the telephone number in question was disconnected, Officer Valdez turned his attention to obtaining Defendant's consent to search the white sedan.

47.     The officer first asked Defendant, in Spanish, if he had anything illegal ("*No tengo nada ilegal?*").  Defendant answered in Spanish with a phrase that the officer interpreted as "everything is good" ("*Y todo esta bien*").  [Tr. 5-27-08, at 63-64.]

48.     Next, the officer asked Defendant in Spanish whether he had anything illegal in the car and whether he could search it ("*Nada ilegal en la carro?*" and *"Yo quieres*

-9-

*chequear.   No problema?*")   Defendant answered in Spanish, "No problem" ("*No problema*").  [Tr. 5-27-08, at 64.]

49.   The officer's next question, in Spanish, was whether he could search everything, *i.e.*, the entire contents of the car ("*Y todo?*").  Defendant agreed.  [Tr. 5-27-08, at 64-65.]

50.   Turning his attention back to the traffic citation, the officer asked Defendant whether he could read English, and Defendant answered yes; then the officer handed the traffic citation to Defendant and asked him to read it and sign it if he agreed.

51.   In the process of obtaining consent for the search and issuing the traffic citation, Officer Valdez took the keys to the white sedan from Defendant and retained them; the recording from the officer's dashboard camera then shows him opening the driver's door to the white sedan with the keys.  [Ex. 10.]

52.   Under the totality of the circumstances, Defendant and his son still were not free to leave the port of entry after Defendant consented to the search and received the traffic citation; in this regard, the officer testified that if Defendant had not consented to the search of the white sedan, the officer would have continued to detain him while applying for a search warrant.

53.   After giving consent to search the vehicle, receiving the traffic citation, and turning over the keys to Officer Valdez, Defendant and his son remained in the waiting room at the port of entry while the officer went outside to the parking lot to begin the search of the white sedan.

54.     Officer Valdez first searched the white sedan's trunk, where he found fabric softener sheets, liquid fabric softener, and a bottle of Old Spice cologne.

55.     These items appeared to be masking agents, as they were not associated with any discernible quantity of laundry, luggage, or shopping bags in the trunk of the vehicle.

56.     Officer Valdez continued searching the white sedan for approximately thirty minutes until he noticed something suspicious about the passenger-side air bag compartment.

57.     While lifting up on the air bag compartment door during his search of the vehicle's dashboard area, Officer Valdez saw an after-market fabric or carpeting material under the door; he had previously found such material to be associated with the presence of hidden compartments in a vehicle, and such hidden compartments were used to conceal illegal drugs.

58.     Several months earlier, Officer Valdez had previously seized a load of cocaine and methamphetamine concealed beneath the air-bag cover and dashboard area in a vehicle traveling from Phoenix, Arizona along Interstate 40.  See United States v. Beltran-Felix, No. CR 07-290 BB, Doc. 55 (D.N.M. Oct. 2, 2007) (unpublished findings of fact and conclusions of law and order denying motion to suppress).

59.     After further manipulating door to the air bag compartment on the white sedan at issue in the present case, the officer could see a package inside, so he drilled into the package and discovered a white powdery substance inside the package which field-tested positive for cocaine.

60.     During his effort to further search the air-bag compartment and retrieve the hidden package in its entirety, Officer Valdez found a little metal latch welded to the bottom of the compartment which allowed the compartment's door to open when manipulated with a screwdriver found on the vehicle's center console; the officer then used this technique to open the compartment door more fully and retrieve the entire package of cocaine.

61.     The evidence obtained from Officer Valdez's search of the white sedan at the port of entry, as well as Defendant's consent to that search, are tainted by the illegality of relocating the traffic stop to the port of entry without probable cause.

62.     Under the totality of the circumstances, Officer Valdez did not establish probable cause to arrest Defendant or perform a more intrusive search of the white sedan (including drilling into the package containing the suspected cocaine) until after he moved the vehicle to the port of entry and discovered the features relating to the air-bag area which suggested that it had been altered from its original, factory condition in order to serve as a hidden compartment.

63.     After discovering the cocaine in the white sedan's air bag compartment, Officer Valdez placed Defendant in handcuffs and advised him of his rights under Miranda v. Arizona, 384 U.S. 436 (1966).

64.     In his subsequent testimony at the suppression hearing on May 27, 2008, Defendant admitted that his son was mistaken in telling the officer that they had been traveling in a red Pathfinder before switching to the white sedan, but he continued to

equivocate and give inconsistent statements about the ownership of the white sedan and how it came into his possession.

65.     At the beginning of his direct examination at the suppression hearing, Defendant testified that he was taking the car to his friend because his friend did not have a driver's license and could not get a license plate.

66.     On cross-examination, Defendant acknowledged a prior statement in which he said he had gone from Denver to Phoenix to deliver a car for a friend named "Jose Garcia," but he then testified that he was driving a car in the opposite direction (from Phoenix to Denver) to take it to "Jose."  [Tr. 5-27-08, at 99-103.]

67.     The above testimony about how Defendant came to possess the white sedan appears to be inconsistent with his earlier statements to Officer Valdez about another vehicle breaking down in Arizona, and in any event, the name of the alleged owner that Defendant provided at the suppression hearing (*i.e..*, "Jose") does not match the name(s) on the vehicle registration, proof of insurance, or the card with the telephone number that Defendant provided to Officer Valdez during the traffic stop.

68.     Defendant's testimony about the ownership of the white sedan and how he came to possess it is not credible; however, the Government has not timely asserted that Defendant lacks Fourth Amendment standing to challenge the search of the white sedan.

69.     At the suppression hearing on May 27, 2008, the Government's counsel advised the Court that he recently discovered that State Police officials conducted an

interview of Defendant after Officer Valdez placed him in handcuffs but before he was turned over to federal agents from the Drug Enforcement Administration (DEA).

70.     Due to this late disclosure, the Court did not hear evidence at the suppression hearing on May 27 2008, as to the admissibility of any statements that Defendant gave in between the time that Officer Valdez placed him in handcuffs and the time that he testified at the suppression hearing.

## II.     LEGAL ANALYSIS AND CONCLUSIONS OF LAW

Defendant contends that all of the incriminating evidence and statements gathered by the Government in this case must be suppressed as "fruit of the poisonous tree" for the following reasons:  (1) Officer Valdez lacked reasonable suspicion or probable cause to conduct a traffic stop of the white four-door sedan in which Defendant and his son were traveling, (2) Officer Valdez exceeded the permissible scope and duration of a traffic stop, (3) Defendant did not knowingly and voluntarily consent to the search of the white sedan or the contents of the vehicle's air-bag compartment, (4) Defendant's statements during the traffic stop were elicited in violation of his <u>Miranda</u> rights, and  (4)  the traffic stop was based on impermissible racial profiling.  Based on the analysis set forth below, I conclude that the traffic stop was justified at its inception and while it remained on the shoulder of the highway; however, the relocation of Defendant and the white sedan to the port of entry exceeded the permissible scope of the traffic stop and was not supported by probable cause. I further conclude that the evidence the Government obtained from the search of the white

sedan at the port of entry must be suppressed because it is tainted by the illegality of moving the traffic stop from the shoulder of the highway to the port of entry.

Defendant also seeks to suppress the statements he made during the investigation, including those made to the State Police or DEA agents after Officer Valdez discovered the suspected cocaine in the vehicle and placed him in handcuffs.  While I conclude that there is no basis for excluding Defendant's initial statements during the traffic stop on the shoulder of the highway, I must defer ruling on the admissibility of Defendant's post-arrest statements because certain discovery materials relating to Defendant's alleged statements to the State Police after his arrest were not turned over to the Defendant until shortly before the suppression hearing on May 27, 2008.  If necessary, the admissibility of those statements will be addressed at a later date.

### A.    Defendant's Fourth Amendment Claims

The Fourth Amendment to the United States Constitution protects Defendant's right to be secure in his person and effects against unreasonable searches and seizures. "[A]utomobiles are 'effects' under the Fourth Amendment, and searches and seizures of automobiles are therefore subject to the constitutional standard of reasonableness."  United States v. Chadwick, 433 U.S. 1, 12 (1977), overruled in part on other grounds, California v. Acevedo, 500 U.S. 565 (1991).  In addition, "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of" the Fourth Amendment.  Whren v. United States, 517 U.S. 806, 809-10 (1996).  Thus, Defendant was seized within the

meaning of the Fourth Amendment when Officer Valdez conducted a traffic stop of the white sedan that Defendant was driving.  See id.

Ordinarily, the seizure occasioned by a routine traffic stop is "reasonable" under the Fourth Amendment "'if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring.'"  United States v. Callarman, 273 F.3d 1284, 1286 (10th Cir. 2001) (quoting United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995) (en banc)).  Further, the reasonableness of such a seizure is not measured by the subjective intentions or motives of the defendant or the officer performing the seizure.  See Arkansas v. Sullivan, 532 U.S. 769, 771-72 (2001).

In this case, I conclude that regardless of the officer's subjective motives, he credibly testified that he saw the white sedan speeding and measured the vehicle's speed using a radar gun.  These credible observations provided reasonable suspicion to conduct the traffic stop. Thus, the traffic stop was justified at its inception.

The next question is whether Officer Valdez exceeded the permissible boundaries of the traffic stop.  Before issuing a traffic citation, the Fourth Amendment permits a police officer who has made a lawful traffic stop to request a driver's license and vehicle registration from the vehicle's occupants, see United States v. Hunnicutt, 135 F.3d 1345, 1349 (10th Cir. 1998), ask about their travel plans and ownership of the vehicle, see United States v. Rivera, 867 F.2d 1261, 1263 (10th Cir. 1989), and respond to objectively reasonable concerns about the officer's safety, see United States v. Holt, 264 F.3d 1215, 1220-26, 1228-

30 (10th Cir. 2001) (en banc).  But the general rule is that a routine traffic stop must end promptly as soon as the traffic citations have been issued and the driver's license, registration, and insurance information have been reviewed and found to be in proper order. See Hunnicutt, 135 F.3d at 1349.

There are two relevant exceptions to this general rule.  "First, the officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occuring."  Id.  "Second, further questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter."  Id.

In this case, the initial detention never became a consensual encounter, and some of the facts recited by the officer as a basis for his suspicions carry little or no weight for purposes of establishing a reason to prolong the traffic stop.  For example, I do not ascribe any legal significance to the alleged "religious icon" attached to the key chain with the keys to the white sedan.  See United States v. Guerrero, 472 F.3d 784, 788 (10th Cir. 2007). While the Court has heard evidence in other cases of a folk hero or saint named "Jesus Malverde" who was allegedly revered by drug traffickers from the Mexican State of Sinaloa, see United States v. Lechuga-Labrada, No. CR 02-657 MCA, Doc. 39 (D.N.M. Aug. 16, 2002), in the present case the officer did not identify with any specificity what religious icon he observed on the key chain or why he believed that it had any particular relationship to drug trafficking.

-17-

Similarly, the officer's initial observation of the tools on the center console area of the white sedan do not have much significance in the Court's determination of whether there was reasonable suspicion to prolong the traffic stop.  While the officer may have subsequently learned that one of the tools found on the center console could be used to open the latch on the hidden compartment, he did not know that the tools had any specific relationship to drug trafficking or hidden compartments at the time he first observed them.  There is nothing uncommon or suspicious about having basic tools such as a screwdriver in a motor vehicle.

The Court also understands that Defendant's demeanor and manner of communication with the officer may have been affected to some degree by the fact that English is not his first language.  There is nothing inherently suspicious about the fact that a highway traveler in Northern New Mexico speaks Spanish as a first language, has a Spanish surname, or is Hispanic.  Such personal characteristics play absolutely no role in the Court's determination of reasonable suspicion or probable cause.

Nevertheless, I conclude that there are other factors which, when viewed together under the totality of the circumstances, are legally sufficient to establish the reasonable suspicion needed to prolong the duration of the traffic stop for the purpose of investigating the white sedan's ownership and whether it was being used to transport some form of contraband.  First, while the officer was gathering the driver's license, vehicle registration, and insurance documents as permitted during a routine traffic stop, he smelled a strong odor consistent with masking agent emanating from the white sedan's passenger compartment.

During this initial phase of the stop, the officer also observed that Defendant's hands were shaking.

The officer's routine questioning during the traffic stop then revealed that Defendant was not the owner of the white Sedan. Defendant also had difficulty identifying who the owner was or how to contact him, and there were inconsistencies between Defendant's statements and those of his son concerning how long they had been in Phoenix and what type of vehicle they were traveling in before they came to possess the white sedan.

Rather than dispelling the officer's suspicion that criminal activity was afoot, this information established an objectively reasonable basis for prolonging the duration of the traffic stop. At that point in time, the officer had reason to further investigate whether the occupants of the white sedan were using it with the owner's permission or were otherwise lawfully in possession of that vehicle. See United States v. Pena, 920 F.2d 1509, 1514 (10th Cir. 1990). Combined with some of the officer's other observations at the scene of the initial traffic stop, the responses Defendant and his son gave to the officer's routine questioning about the vehicle's ownership and their travel plans also gave rise to a reasonable suspicion that the vehicle was involved in smuggling narcotics. See Guerrero, 472 F.3d at 788 (citing United States v. Zubia-Melendez, 263 F.3d 1155, 1162 (10th Cir. 2001), and United States v. Kopp, 445 F.3d 1450, 1453-54 (10th Cir. 1995)).

The next question is whether, on the basis of these suspicions, the Fourth Amendment permitted Officer Valdez to move the location of the traffic stop from the shoulder of the roadway to the port of entry a short distance away. At the outset, I note that this relocation

of the traffic stop was not accomplished with Defendant's consent.  As shown on the recording from the officer's dashboard camera [Ex. 10], the officer did not *ask* Defendant to follow him to the port of entry or explain where he was going.  Rather, he simply *told* Defendant to follow him to "the port" in a context where a reasonable person would understand the officer's words to be a command.  Such an understanding is consistent with the fact that the officer had not yet completed the procedure for issuing the traffic citation or given the Defendant any indication that he was free to resume his trip to Denver without completing that procedure.  Thus, Defendant continued to be seized within the meaning of the Fourth Amendment when the traffic stop was relocated to the port of entry, and such relocation was not accomplished with Defendant's knowing and voluntary consent.  See United States v. Recalde, 761 F.2d 1448, 1453-54 (10th Cir. 1985), overruled in part on other grounds by United States v. Price, 925 F.2d 1268, 1270-71 n.3 (10th Cir. 1991) (en banc).

When such consent is lacking, the general rule is that transporting an individual from the scene of a traffic stop to a police station or similar official government facility has the effect of transforming an investigative detention into a *de facto* arrest and therefore requires a showing of probable cause.  See generally 4 Wayne R. LaFave, Search and Seizure:  A Treatise on the Fourth Amendment § 9.2(g), at 355-56 n.266 (4th ed. 2004) (collecting cases); see, e.g., United States v. Shareef, 100 F.3d 1491, 1508 (10th Cir. 1996); United States v. Gonzalez, 763 F.2d 1127, 1131-33 (10th Cir. 1985); Recalde, 761 F.2d at 1456-57.  Courts have recognized exceptions to this rule against moving the location of an investigative detention where such movement is a reasonable means of achieving the legitimate goals of

the investigation, such as allowing a victim or witness to a known crime to identify the suspect.  See, e.g., United States v. McCargo, 464 F.3d 192, 198 (2d Cir. 2006).

But this exception has been construed very narrowly where the location to which the suspect is moved is a police station or other official government facility (such as an airport office).  See 4 Wayne R. LaFave, supra § 9.2(g), at 356-57 (citing Hayes v. Florida, 470 U.S. 811 (1985)).  In that type of situation, the authorities cited above may require the Government to show that moving the suspect to the police station or a similar government facility was made necessary by truly exigent circumstances, which the Tenth Circuit defined as "imminent danger of death or serious bodily harm, imminent danger of destruction of important property, response to an emergency, or hot pursuit of a fleeing felon."  Gonzalez, 763 F.2d at 1132 n.5.  At a minimum, the Court is required to consider "the other alternatives available to the officer at the time of the stop."  Id. at 1133.

In this instance, the Government has not met its burden of showing that the relocation of the traffic stop to port of entry was made necessary by exigent circumstances or the unavailability of less intrusive alternatives.  Officer Valdez explained that better telephone service provided his rationale for moving the location of the stop, but he did not explain why it was *necessary* to move the entire investigation to the port of entry for that purpose, rather than employing less intrusive alternatives such as checking a police database to determine whether the vehicle was reported stolen, using his police radio to request that another officer make the telephone call from the port of entry and relay the result back to him through his dispatcher, or simply asking Defendant "for consent to search the car then and there."  Id. at

1130.  In particular, the Government has not cited any specific safety concerns about the location of the initial traffic stop, road conditions, weather, visibility, the level of highway traffic, or the number or behavior of the vehicle's occupants which would contribute to a showing of exigent circumstances.

Having failed to show that the relocation of the traffic stop was prompted by exigent circumstances or that less intrusive alternatives were unavailable, the Government's remaining options for establishing the reasonableness of the continued detention at the port of entry are to show that the officer already established probable cause before moving the traffic stop to that location, or to show that the port of entry did not present the same type of coercive atmosphere as a police station.

I first consider whether Officer Valdez established probable cause to arrest Defendant or to search and seize the white sedan before moving the traffic stop from the shoulder of the highway to the port of entry.  With respect to this issue, the facts of this case are remarkably similar to those before the Tenth Circuit in Gonzalez, 763 F.2d at 1128.  Both cases involved a traffic stop where an officer smelled a peculiar odor emanating from the vehicle as it was parked beside the roadway and then encountered "bizarre circumstances" concerning the relationship between the vehicle's driver and an unknown owner during the initial review of the driver's license and vehicle registration.  Id. at 1130.  While such circumstances undoubtedly provide reasonable suspicion to prolong the traffic stop in its initial location beside the roadway, the Government presented no authority in either case to suggest that this fact pattern alone establishes probable cause for a *de facto* arrest or a full-scale search of a

vehicle.  Thus, the Tenth Circuit's reasoning in Gonzalez compels the conclusion that Officer Valdez had not established probable cause before moving the traffic stop to the port of entry.

Whether the port of entry at issue here is equivalent to the police stations at issue in Gonzalez and Recalde presents a closer question.  The evidence of record suggests that the port of entry atop Raton Pass where Defendant was detained is a public facility in the sense that it is frequented by truck drivers who use it to obtain required permits and inspections for their commercial vehicles upon entering the State of New Mexico.  In that context, courts have permitted warrantless inspections of commercial vehicles to occur at the State's ports of entry because they meet the test for regulatory searches articulated in New York v. Burger, 482 U.S. 691 (1987).  See, e.g., United States v. Mitchell, 518 F.3d 740, 751-52 (10th Cir. 2008).

Members of the general motoring public, however, have a different relationship with the State's ports of entry because unlike commercial truck drivers, they have not voluntarily entered into a closely regulated business requiring the type of permits and inspections that generally occur at such locations.  In this regard, the Government cites no authority to suggest that, absent Officer Valdez's commands, there would be any reason for Defendant to visit the port of entry of his own accord (e.g., to obtain a permit or undergo some type of vehicle inspection).

Thus, from the perspective of a reasonable traveler who is not engaged in commercial trucking, the type of port of entry at issue here is distinguishable from public transportation facilities such as airports and bus stations because it is associated more exclusively with law

enforcement and, therefore, more akin to a police station.  I also cannot ignore the fact that, despite whatever other activities were occurring at the port of entry with respect to the regulation of commercial trucking, Officer Valdez was using that facility as a *de facto* police station for detaining and questioning Defendant.

I therefore conclude that, even though Defendant was not taken into a private interrogation room at the port of entry, his detention at that location violated the Fourth Amendment because it exceeded the permissible scope of a traffic stop and was not justified by probable cause or consent.  I next address what effect, if any, this Fourth Amendment violation has on the admissibility of the evidence obtained as a result of Officer Valdez's search of the white sedan.

### B.   Application of the Exclusionary Rule

The fact that a constitutional violation occurs does not necessarily mean that evidence obtained from a search must be suppressed.  "A party seeking exclusion of evidence on Fourth Amendment grounds must demonstrate both actual police misconduct that violated the defendant's Fourth Amendment rights, and that the evidence to be excluded was in fact a product of the police misconduct."  United States v. Williams, 356 F.3d 1268, 1272 (10th Cir. 2004) (citing United States v. DeLuca, 269 F.3d 1128, 1132 (10th Cir.2001) and United States v. Nava-Ramirez, 210 F.3d 1128, 1131 (10th Cir.2000)).  "'Only if the defendant has made these two showings must the government prove that the evidence sought to be suppressed is not "fruit of the poisonous tree," either by demonstrating the evidence would have been inevitably discovered, was discovered through independent means, or was so

attenuated from the illegality as to dissipate the  taint of the unlawful conduct.'" <u>DeLuca</u>, 269 F.3d at 1132 (quoting <u>Nava-Ramirez</u>, 210 F.3d at 1131) (citations omitted).  "It is thus incumbent upon a defendant to demonstrate some affirmative link between the police misconduct and the evidence obtained." <u>Williams</u>, 356 F.3d at 1272.

In the present case, Defendant has met this burden with respect to the evidence obtained from the search of the white sedan at the port of entry, because there is a factual nexus between such evidence and the Fourth Amendment violation which preceded its discovery, *i.e.*, moving the traffic stop to the port of entry.  "The Supreme Court has consistently held that evidence obtained after an illegal arrest or seizure must be suppressed as the fruit of the illegal detention." <u>Recalde</u>, 761 F.2d at 1457 (citations omitted).

Thus, the burden shifts to the Government to show that a relevant exception to the exclusionary rule applies here.  The first exception to consider is whether the discovery of the incriminating evidence is attenuated from the prior illegality.  The Tenth Circuit has recognized that "if there is sufficient attenuation between an illegal detention and a consent to search, the search may be valid despite the prior illegal acts of the officer." <u>Gonzales</u>, 763 F.2d at 1133.   To determine whether "a defendant's consent may, under certain circumstances, remove the taint of an illegal detention," <u>Recalde</u>, 761 F.2d at 1457, the Court considers "temporal proximity . . . , the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." <u>Brown v. Illinois</u>, 422 U.S. 590, 603-04 (1975) (footnote and citations omitted).

When a consent to search is *not* preceded by an illegal detention, then it is possible for that consent to be knowing and voluntary even though the defendant continues to be *lawfully* detained at the time consent to search is requested and given.  See United States v. Rodriguez-Garcia, 983 F.2d 1563, 1567 (10th Cir. 1993); cf. Price, 925 F.2d at 1270-71 (concluding that the fact of detention alone does not create a presumption that consent is involuntary).  But when the consent to search occurs *after* an *illegal* detention, the Government bears a heavier burden to establish that the consent is not tainted by such illegal detention.  See Recalde, 761 F.2d at 1457.  In the latter situation, "the Government must establish a break in the causal connection between the illegality and the evidence thereby obtained."  Id. at 1458.

No such break is present here.  Defendant's consent to search was requested and received *during* the first several minutes of the illegal detention at the port of entry, and there was no indication that Defendant was free to leave the port of entry at any time either before or after his consent was requested or received.  Officer Valdez was still completing the procedure for issuing the traffic citation at the time he requested and received Defendant's consent to search the white sedan, and then he took the keys to the white sedan from Defendant.  No Miranda warnings had yet been given, and the officer was not about to permit Defendant or the white sedan to leave the port of entry after issuing the traffic citation because he was still conducting his investigation of the sedan's ownership and possible use in smuggling narcotics.  Thus, as in Gonzalez and Recalde, the factors of temporal proximity, lack of intervening circumstances, and purposefulness of the illegal detention all weigh in

favor of finding that Defendant's consent to search was tainted by the illegal detention in this case.

Nevertheless, the Government may still avoid the suppression of the evidence by demonstrating that one or more of the following doctrines apply.  First, under the "independent source" doctrine, evidence discovered during an unlawful search or seizure is not subject to suppression if the officer later lawfully obtained that evidence from another source that is "wholly unconnected with the initial" violation.  Murray v. United States, 487 U.S. 533, 535 (1988) (citing Segura v. United States, 468 U.S. 796, 813-14 (1984)).  "The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation."  Nix v. Williams, 467 U.S. 431, 443 (1984).

Closely related to the "independent source" doctrine is the "inevitable discovery" doctrine.  "When . . . the evidence in question would inevitably have been discovered without reference to the police error or misconduct, there is no nexus sufficient to provide a taint and the evidence is admissible."  Id. at 448.  These two doctrines share a common rationale, namely that:

> 'the interest of society in deterring unlawful police conduct and the  public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred.... When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.'

Murray, 487 U.S. at 537 (quoting Nix, 467 U.S. at 443).

Here the Government appears to assert that even if Defendant had refused to consent to the search of the white sedan, or his consent was disregarded as a tainted product of the illegal detention at the port of entry, then Officer Valdez still could have detained the car and its occupants while obtaining a search warrant.  In order to prevail on this argument, however, the Government must first show that Officer Valdez had *probable cause* to obtain the warrant based on the information available to him before the search.  See United States v. Cunningham, 413 F.3d 1199, 1203-05 (10th Cir. 2005) (citing United States v. Souza, 223 F.3d 1197, 1204-05 (10th Cir. 2000)).  Because Gonzalez and Recalde both indicate that the type of fact pattern presented here establishes reasonable suspicion to prolong a traffic stop but falls short of establishing probable cause for a more intrusive search or seizure of the vehicle, I do not have "confidence that the warrant in fact would have been issued and that the specific evidence in question would have been obtained by lawful means." Souza, 223 F.3d at 1203.  Moreover, there is no evidence that Officer Valdez took steps to obtain a warrant, nor would there be a requirement that he do so if he already had established probable cause prior to the search, because in that instance the "automobile exception" would authorize a warrantless search of the white sedan based on probable cause alone.  See generally Florida v. Myers, 466 U.S. 380, 382 (1984); Chambers v. Maroney, 399 U.S. 42, 51-52 (1970).  Accordingly, in the absence of probable cause, the Government cannot avail itself of the argument that the evidence obtained from the white sedan would have been inevitably or independently discovered by means of a search warrant.  It follows that this evidence must be suppressed under the exclusionary rule.

-28-

### C.  **Defendant's Pre-Arrest Statements**

Defendant contends that regardless of whether the traffic stop was justified under the Fourth Amendment, his statements to Officer Valdez should be suppressed on independent grounds provided by the Fifth and Fourteenth Amendments.  There are "two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence:  the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment."  Dickerson v. United States, 530 U.S. 428, 433 (2000).  The Fifth Amendment inquiry applies to "the admissibility in evidence of any statement given during custodial interrogation of a suspect" and depends on whether the police provided the suspect with the four warnings required under Miranda v. Arizona, 384 U.S. 436 (1966).  Dickerson, 530 U.S. at 435.  In these situations the Government generally bears the burden of proving that a defendant's waiver of his or her Miranda rights is knowing and voluntary.  See United States v. Toro-Pelaez, 107 F.3d 819, 825 (10th Cir. 1997).  But "[a]n express statement of waiver by the defendant is not required; instead, waiver can be inferred from the defendant's actions and words."  Id.

Apart from the Fifth Amendment standards articulated in Miranda and its progeny, the admissibility of a statement obtained from a suspect by police officer may still be challenged on due-process grounds.  See Dickerson, 530 U.S. at 434.  The due-process inquiry "examines 'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession."  Id. (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)).

-29-

In this case, Officer Valdez credibly testified that he fully advised Defendant of his Miranda rights at the time of his arrest shortly after the suspected cocaine was discovered, and the evidence presented thus far does not indicate that any of Defendant's statements were involuntary for purposes of the due-process inquiry.  Nevertheless, the Court will defer ruling on the admissibility of any incriminating statements made after the Miranda warnings were given because some of those statements were only recently disclosed to Defendant's counsel.

Defendant's motion papers also question whether the statements he made during the traffic stop *before* he was directed to go to the port of entry were taken in violation of his Miranda rights.  That question can be answered now based on the record developed at the suppression hearing on May 27, 2008.

There is established precedent holding that *roadside* questioning of a motorist during a routine traffic stop does not constitute custodial interrogation, and thus officers need not provide a motorist with Miranda warnings before making such inquiries.  See Berkemer v. McCarty, 468 U.S. 420, 435-41 (1984); Pena, 920 F.2d at 1515; United States v. Pelayo-Ruelas, 345 F.3d 589, 592 (8th Cir. 2003).  However, the  Supreme Court also held that a defendant was "in custody" for Miranda purposes when he was transported from the scene of a traffic stop in the back of a police car and delivered to the police station for further questioning.  See Berkemer, 468 U.S. at 434-35.  Similarly, the Tenth Circuit has recognized that Miranda may be implicated where the amount of force used to effectuate an investigative detention is so intrusive that it rises to the level of a full custodial arrest,  See United States v. Perdue, 8 F.3d 1455, 1464-65 (10th Cir. 1993), or where the suspect is confined within a

private interrogation room at a police station, see United States v. Griffin, 7 F.3d 1512, 1519 (10th Cir. 1993).

On the other hand, the mere relocation of a motorist from the seat of his own car to the seat of a police car does not, in and of itself, transform a traffic stop into a custodial arrest that implicates Miranda concerns.  See United States v. Raynor, 108 Fed. Appx. 609, 613 (10th Cir. 2004) (unpublished disposition); United States v. Speal, 166 F.3d 350, 1998 WL 886757, at *5 (10th Cir. 1998) (same).  Similarly, courts have held that Miranda is not implicated when the duration of a routine traffic stop is extended for a limited amount of time in order to further investigate unanswered questions or inconsistent responses regarding a vehicle's ownership.  See United States v. Martinez, 983 F.2d 968, 975-77 (10th Cir. 1992) (citing  United States v. Wong Ching Hing, 867 F.2d 754, 756 (2d Cir.1989)).

It follows from the above authorities that Defendant's statements to Officer Valdez during the initial phase of the traffic stop on the shoulder of the highway do not implicate Miranda.  I reach the same conclusion as to Defendant's verbal responses to the officer's request for consent to search the white sedan at the port of entry.

Even when a defendant and an automobile are lawfully in police *custody*, "[a]n officer's request to search . . . [the] automobile does not constitute *interrogation* invoking a defendant's Miranda rights." United States v. McCurdy, 40 F.3d 1111, 1118 (10th Cir. 1994) (emphasis added); see United States v. Curls, 219 Fed. Appx. 746, 754-55  (10th Cir. 2007) (unpublished disposition).  Thus, "[t]he failure of officials to give Miranda warnings before asking for consent does not prohibit the use of a defendant's in-custody statements granting

consent to a search." United States v. Stevens, 487 F.3d 232, 242 (5th Cir. 2007) (citations omitted).   "A statement granting 'consent to a search ... is neither testimonial nor communicative in the Fifth Amendment sense.'" Id. (quoting Wayne R. LaFave, Jerold H. Israel, & Nancy J. King, Criminal Procedure § 3.10 (4th ed.2004)).  Thus, while Defendant's consent to search is tainted by the illegal detention for Fourth Amendment purposes, the Fifth Amendment provides no independent basis for suppressing his verbal responses to the officer's request for consent.

### D.   Defendant's Selective Enforcement Claim

Defendant's next contention is that Officer Valdez singled him out for greater scrutiny based on his race or national origin (Hispanic or Mexican American).  In support of this claim, Defendant cites another recent case in which Officer Valdez found illegal drugs hidden in a vehicle's air-bag compartment during a traffic stop of an individual who appeared to be Hispanic or had a Spanish surname.  See United States v. Beltran-Felix, No. CR 07-290 BB, Doc. 55 (D.N.M. Oct. 2, 2007) (unpublished findings of fact and conclusions of law and order denying motion to suppress).  I find, however, that neither the findings in Beltran-Felix nor any other evidence presented at the hearing on May 27, 2008, provide a valid basis for Defendant's selective enforcement claim.

Claims of selective enforcement based on presumptively impermissible factors such as race or national origin generally do not implicate the Fourth Amendment but instead require another constitutional basis, such as the Fourteenth Amendment's Equal Protection Clause.  See Whren, 517 U.S. at 813.  The essential elements of a selective enforcement

-32-

claim under the Equal Protection Clause include both discriminatory effect and discriminatory intent.  See United States v. James, 257 F.3d 1173, 1178 (10th Cir. 2001); Poole v. County of Otero, 271 F.3d 955, 958 (10th Cir. 2001), abrogated in part on other grounds by Hartman v. Moore, 547 U.S. 250, 256 (2006).  To prove discriminatory effect, Defendant must make a credible showing that a similarly-situated individual "could have been prosecuted for the offense for which the defendant was charged, but was not." James, 257 F.3d at 1179; accord Poole, 271 F.3d at 958.  As to discriminatory intent, "'the defendant must prove that the government's selection of him for prosecution was invidious or in bad faith and was based on impermissible considerations such as'" his race or the desire to prevent his exercise of constitutional rights.  Poole, 271 F.3d at 958-59 (quoting United States v. Furman, 31 F.3d 1034, 1037 (10th Cir. 1994)).  To the extent that Defendant is challenging the officer's initial decision to single him out for a traffic stop, or to subject him to additional scrutiny during that stop, similar considerations would apply.

In this instance, Defendant's cursory allusions to racial profiling or selective enforcement do not provide the necessary factual basis or legal argument to show that the essential elements of a selective enforcement claim have been satisfied.  Defendant has not elicited any meaningful testimony in this case concerning the number of Hispanic individuals or individuals with Spanish surnames that Officer Valdez has detained via pretextual traffic stops or the number of suspects of other races or national origins that the officers could have lawfully detained by such means but did not.  Simply providing anecdotal information from another case which cannot be tested through cross-examination in this case does not suffice

to show selective enforcement.  Thus, Defendant has not shown that he is entitled to suppression of the evidence or the dismissal of the charges in this case based on a selective enforcement claim.  See Poole, 271 F.3d at 959; James, 257 F.3d at 1181.

      **E.**      **Defendant's Motion to Dismiss or Strike**

      Following the Government's belated disclosure of the discovery materials regarding Defendant's post-arrest statements to the State Police on the eve of the suppression hearing, the Court gave Defendant an opportunity to amend or supplement his motion in order to address these materials.  Defendant responded by filing an *Amended Motion to Dismiss for Government's Failure to Comply with Continuing Duty to Disclose Under Rule 16, Fed. R. Crim. P. or in the Alternative Motion to Strike Waiver of Rights* [Doc. 46] on June 9, 2008. Defendant's amended motion only requests discovery sanctions and does not further address whether any of the recently disclosed post-arrest statements must be suppressed as "fruit of the poisonous tree" or on any independent constitutional grounds such as Miranda or due process.

      In response to Defendant's motion to dismiss or strike, the Government asserts that the Court should not turn to the more extreme sanctions of dismissing the *Indictment* or striking the evidence unless and until it has first ruled out the possibility that the potential for unfair prejudice caused by the late disclosure can be cured by means of a continuance of the suppression hearing and/or the trial date.  See United States v. Ivy, 83 F.3d 1266, 1280 (10th Cir. 1996).  The Court agrees that the proper approach is to "impose the least severe sanction that will accomplish prompt and full compliance with the discovery order."  United States

v. Gonzales, 164 F.3d 1285, 1292 (10th Cir. 1999).   "The preferred sanction is a continuance."  United States v. Golyansky, 291 F.3d 1245, 1249 (10th Cir. 2002).

Defendant has not presented any argument, authority, or evidence to suggest that the Government intentionally delayed disclosure of the materials regarding post-arrest statements to State Police in bad faith or for the purpose of causing unfair prejudice.  To avoid such prejudice, the Court did not hear evidence or argument regarding the admissibility of the post-arrest statements in question at the suppression hearing on May 27, 2008.  Thus, Defendant was not forced to cross-examine the State Police witnesses or develop other evidence regarding the circumstances of those post-arrest statements without the benefit of discovery.

On the contrary, the Court deferred the hearing as to the post-arrest statements in order to give Defendant and his counsel more time to review the recently disclosed discovery materials and formulate a response to them.  Now that such an opportunity has been provided, Defendant has not asserted any additional or independent grounds for suppressing his post-arrest statements except for the belated disclosure of the discovery materials from the State Police.

Under these circumstances, the Court concludes that any potential for unfair prejudice arising from this belated disclosure is cured by the Court's deferral of the suppression hearing as it pertains to Defendant's post-arrest statements.  The remaining issues to be addressed at such a hearing may be moot in light of the Court's decision to suppress the drug evidence seized from the white sedan.  To the extent that the parties believe that such issues

are not moot (*i.e.*, that Defendant's post-arrest statements are not subject to the "fruit of the poisonous tree" doctrine or that their admissibility must be determined on other grounds), they shall so inform the Court in writing by no later than August 26, 2008, and advise the Court as to whether additional briefing or an additional hearing is needed for this purpose. If an additional hearing is requested, the parties shall also address whether or to what extent the need for such a hearing will impact the currently scheduled trial date of September 8, 2008.

## III.   <u>CONCLUSION</u>

For the foregoing reasons, the Court determines that Defendant's detention at the port of entry violated the Fourth Amendment and that both his consent to search the white sedan and the results of that search are tainted by this Fourth Amendment violation.  As a result, the evidence discovered from the search of the white sedan must be suppressed under the exclusionary rule.

I reach a different conclusion as to any statements or evidence obtained by Officer Valdez during the initial traffic stop on the shoulder of the roadway.  Therefore, the evidence and statements falling into this category need not be suppressed.

Finally, I do not address the admissibility of Defendant's post-arrest statements in this *Memorandum Opinion and Order*.  The issues of whether such statements are tainted by the Fourth Amendment violation noted above, or must be excluded on independent grounds, may be moot in light of the Court's decision to suppress the evidence discovered from the search

of the white sedan.  To the extent that the parties believe otherwise, they shall so inform the Court in writing by no later than August 26, 2008, as directed below.

**IT IS THEREFORE ORDERED** that *Defendant's Motion to Suppress Evidence Obtained as a Result of Illegal Stop, Detention/Arrest, Search and Seizure and Motion for Suppression of Illegally Obtained Evidence and Statements* [Doc. 34] is **GRANTED IN PART** with respect to the evidence obtained from the search of the white sedan at the port of entry and **DENIED IN PART** with respect to the evidence and statements obtained during the initial traffic stop on the shoulder of the highway.

**IT IS FURTHER ORDERED** that *Defendant's Amended Motion to Dismiss for Government's Failure to Comply with Continuing Duty to Disclose Under Rule 16, Fed. R. Crim. P. or in the Alternative Motion to Strike Waiver of Rights* [Doc. 46] is **DENIED**.

**IT IS FURTHER ORDERED** that the parties shall advise the Court in writing (to be filed of record herein) by no later than August 26, 2008, as to whether they believe an additional hearing or additional briefing is necessary in order to address the admissibility of Defendant's post-arrest statements; if additional briefing or an additional hearing is requested, the parties shall also address the need to continue the trial date.

**SO ORDERED**, this 19th day of August, 2008, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge